Haywood, J.
delivered the opinion of himself and Judge Peck.
This was a writ of error from the Circuit Court of Montgomery. An action of assumpsit was commenced against the defendant as indorser of a bill single made by Patrick H. Darby, payable to the defendant or order for three hundred dollars, dated the 19th February, 1819, twelve months after date, and by him indorsed to the plaintiff. A demand of payment was made of the maker the latter part of the second week in March, after the Supreme Court of Errors at Charlotte. Notice was given in writing to the defendant, on the 31st March, 1820, of the non-payment. Darby resided in Nashville, and was in Nashville on the 22d February, 1820, and until the 24th ; on which latter day he left that place for Russellville, and was absent from home in the State of Kentucky fifteen days after the 24th Februarj'. During the session of the Circuit Court of Montgomery, the defendant was informed by Mr. Huling, who had the note or bill single in his hands for collection, that the maker had gone to Kentucky, as he had been informed, and that plaintiff would look to him for payment of the money. Darby arrived in Nashville one evening, and started the next morning to the Supreme Court at Charlotte, and arrived there on Wednesday or Thursday of the term ; and on the second day after he arrived there, demand of payment was made by Mr. Turley, who had the note. The Court below instructed the jury that'due diligence had been used by the plaintiff; to which opinion the defendant excepted. The jury found a verdict for the plaintiff.
The question raised by the record is, on what day should the demand of payment have been.made by the indorsee? Bills single of the description of that which is in controversy are put by the law of 1786, ch. 4, on the same footing with promissory notes, which were made negotiable by the Act of 1762, ch. 9. In the infancy of promissory notes, when rendered negotiable, it was holden in general terms, that demand must be made in a reasonable time. The undefined limits of this time were found by experience to be productive of uncertainty, because of the various opinions which juries in- different trials entertained of its meaning; and, to remove this *146 inconvenience, tlie judges determined that demand of payment should be made of the maker when the note became due, and that was settled to be on the third day of grace, exclusive of the day appointed for payment; and if that happened on Sunday, then the demand to be made on the day preceding. Proceeding on these rules, the demand in the present case should have been made on the 22d day of February, 1820. Where circumstances intervene to render the demand improper or impossible to be made on the third day of grace, such as war, pestilence, great holy-days, or absence of the maker from the State, a further time is allowed ; and, under some peculiar circumstances, a modification of the manner is introduced; but these exceptions need not be particularly noted in the present case, as' no facts here occurred on which to found an exception. For want of a demand, therefore, on the 22d February, 1820, the indorser is discharged from his liability, the same being only conditional, in case of a demand in due time and non-payment upon such demand by the maker.
But it is urged with considerable force by the counsel for the plaintiff that though the law of England and of several commercial States in this Union be in consonance with this conclusion, that such is not the law of this State, because of a difference in our circumstances from theirs, the same precise punctuality being not necessary for an agricultural people as for those who depend on commercial pursuits. The decisions of North Carolina, made soon after the Revolution, are referred to as proving the correctness of this remark, those decisions being upon the Act of 1762, which alone rendered notes negotiable, and imparted to them the qualities which they possess in consequence of their negotiable character. It cannot be denied that the decisions referred to do not conform to those which have been made in modern times in Great Britain and in our sister States. It is to be observed, however, that the law of North Carolina was manifestly in an unsettled state, and that every subsequent adjudication, in proportion as the people grew in experience, approached still nearer and nearer to the present standard, till, finally, they have come to the adoption of the same rules which present circumstances recommend to ourselves. Increased population and commerce, as well- of ourselves as our neighbors, have introduced an extended circulation of negotiable paper, and new and more frequent occasions of perceiving the necessity of rules to promote it, and to prevent the inconvenience to which it is exposed by too much laxity in the conduct of those who are concerned in it. . A growing similarity of circumstances evinces the propriety of assuming a similar system and profiting by the experience of others. Whilst we compare our own situation with theirs, considering the rapid advancements we are making in commercial pursuits, it is evident that our course should be so shaped as to avoid the inconveniences from which they have excluded themselves. One great incentive to it is the manifest want of system to regulate contracts in relation *147 to negotiable paper. If we reject the one which is already proffered to us by the past experience of other commercial countries, we shall have to originate new ones ; and after a long struggle with uncertainty, we shall find ourselves in circumstances which impose a necessity for the same laws which like circumstances have imposed on others, and shall be obliged eventually to conform to the same regulations which others have found indispensable. It is more eligible to conform at once, and be in readiness to keep pace with other States in the emendations which successive emergencies shall call for. Our traders are already spread over the face of the whole country, and many of their transactions are carried on through the medium of negotiable paper originating in other States. It is for the advantage of our merchants that the foreign paper which they receive should possess all the value that can be secured to it by the strictest injunctions of punctuality. And as this paper is to replace our own domestic instruments, which the law for the facility of interchange had made negotiable ; and as this will not be done if permanent value be not affixed to the latter by regulations having the same ends in view, and the same effects also, it is an object of the highest concernment to the agricultural interests of Tennessee that regulations which secure those ends should not be rejected and that our paper be made as nearly as possible a real and true representative of metallic medium ; this being the only means by which the rewards of industry and labor can be made secure and permanent.
Judgment reversed.